**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| BROOKE A. MEDAS, ) | |
| c/o Friedman & Gilbert ) | |
| 55 Public Square, Suite 1055 ) | CASE NO. _____ |
| Cleveland, Ohio 44113 ) | |
| ) | |
| -and- ) | |
| ) | |
| BROOKE A. MEDAS, as mother ) | JUDGE _____ |
| and next best friend of ) | |
| Z.M., a minor, ) | |
| c/o Friedman & Gilbert ) | MAGISTRATE JUDGE _____ |
| 55 Public Square, Suite 1055 ) | |
| Cleveland, Ohio 44113 ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| -vs- ) | **COMPLAINT** |
| ) | |
| MICHAEL MARESH, #A642451 ) | (JURY TRIAL DEMANDED) |
| c/o Belmont Correctional Institution ) | |
| P.O. Box 540 ) | |
| 68518 Bannock Road ) | |
| St. Clairsville, Ohio 43950 ) | |
| ) | |
| -and- ) | |
| ) | |
| JOEL GAISER ) | |
| c/o Parma Justice Center ) | |
| 5555 Powers Blvd. ) | |
| Parma, Ohio 44129, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

1.      This civil action seeks monetary damages for the extraordinary injuries and losses suffered by Plaintiffs Brooke Medas and Z.M., for the frightening, and emotionally and physically traumatizing rape perpetrated against Brooke by her probation officer, Defendant Maresh. Prior to this abusive act of sexual battery, for which Defendant Maresh has been convicted, Defendant Gaiser hired Defendant Maresh as a Bailiff, and then as a Probation Officer. Defendant Gaiser hired Defendant Maresh despite his knowledge of prior sex crime-related allegations against Maresh, and despite numerous other red flags (which led to his rejection for other jobs with the City of Parma), all of which were explicitly communicated to Defendant Gaiser prior to his decision to hire Maresh. Plaintiffs Medas and Z.M. now bring this suit for violations of their rights under federal and state law.

### JURISDICTION

2.      This action arises under laws of the United States, and jurisdiction is conferred on this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). Supplemental jurisdiction of the Court over the claims arising under state law is invoked under 28 U.S.C. § 1367 (supplemental jurisdiction).

### VENUE

3.      Venue in the Northern District of Ohio is proper under 28 U.S.C. § 1391(b), because it is the district in which a substantial part of the events or omissions giving rise to the claims occurred.

**JURY DEMAND**

4.      Plaintiffs request a jury trial on the issues and claims set forth in this Complaint.

**THE PARTIES**

5.      At all times mentioned hereto, Plaintiffs Brooke Medas and Z.M. were residents of Cuyahoga County, the State of Ohio, and the United States.

6.      At all times mentioned herein, Defendant Michael Maresh was employed as a Probation Officer for Parma Municipal Court, and was acting in the capacity as an officer of the Court and the City of Parma under the color of state law, and is being sued in his personal and/or official capacity.

7.      At all times mentioned herein, Defendant Joel Gaiser was  employed as the Court Administrator for Parma Municipal Court in the City of Parma, and was acting as an officer of the Court and the City of Parma under the color of state law, and is being sued in his personal and/or official capacity.

**FACTS**

8.      This suit arises out of Defendant Maresh's disturbing and violative conduct while serving as Ms. Medas' Probation Officer, and, prior to and enabling that conduct, from Defendant Gaiser's shocking decision to hire him.

**Defendant Maresh Was Rejected as a Candidate for Both Parma Corrections Officer and Parma Auxiliary Police Based upon Concerning Facts from His Past, Including a Sex Crime-Related Allegation, Among Other Issues.**

9.      Turning to the beginning of this story, Defendant Maresh tried to find employment with the City of Parma long before he became a Probation Officer. In 2009, he applied for a Corrections Officer position. After the Parma Police performed a background check, and a pre-

employment polygraph was administered, Parma Detective Mickey Adams put together a background check memorandum for Luis Galizio, the Parma Jail Administrator.

10.     The memorandum reflected several unfavorable background facts, including, for example, that: (1) Defendant Maresh had been the suspect in a case involving abusing a minor in Parma in 1996; (2) Maresh had been a suspect in a case involving sexual imposition in Parma in 2002; (3) Maresh admitted to theft from his employers, resulting in being fired from two jobs; (4) Maresh admitted to having a serious disagreement with his supervisors in his capacity as a corrections officer for the City of Broadview Heights; (5) Defendant Maresh made ten "900" sex telephone calls and other obscene calls as a teenager; and (6) Maresh admitted to illegal use of marijuana from 2003 to 2007.

11.     Louis Galizio considered the background check memorandum produced by Detective Adams, and issued a rejection letter to Defendant Maresh. Galizio summarily rejected Maresh as a candidate on the basis of the marijuana use, which ran contrary to hiring policies, and did not have to consider the other issues raised in the background check.

12.     In 2010, Defendant Maresh again attempted to get a job with the City of Parma, this time as an Auxiliary Police Officer. Again, Detective Mickey Adams prepared a background check memorandum. This time, Adams reiterated in his memo that Defendant Maresh had been the subject in a case involving abusing a minor in Parma in 1996, and a suspect in a case involving sexual imposition in Parma in 2002. The memorandum was submitted to Parma Auxiliary Police Commander George Balasko. Balasko found these background facts to be alarming.

13.     In considering Det. Adams' background memorandum, Commander Balasko had additional personal knowledge of problematic facts from Defendant Maresh's past. Commander Balasko was aware of an incident from Defendant Maresh's youth, when he was involved in a

youth unit called the "Explorers." The Explorers sometimes assisted Auxiliary Police during events, such as high school football games. In this particular incident, Commander Balasko recalled Maresh to have been found with equipment belonging to the Auxiliary Police, which he was not authorized to possess. Further, though various Auxiliary Police Officers interviewed Maresh for the Auxiliary Police position and gave him shining reviews, Commander Balasko was still concerned: he recalled Maresh going through the Auxiliary Police interview process previously, and subsequently "dropp[ing] off the grid."

14.     Commander Balsko's personal knowledge of Defendant Maresh, coupled with the unsavory facts presented in Detective Adams' background check, led Balasko to reject Maresh for the Auxiliary Police position.

### Despite Defendant Maresh's Possible Commission of a Sex Crime against His Cousin, Among Other Criminal Allegations and Highly Concerning Facts, Defendant Gaiser Hired Maresh as a Probation Officer.

15.     Yet, Defendant Maresh tried again to be hired by the City of Parma. He applied to the position of Bailiff/Probation Officer in July of 2011.

16.     In August 2011, Detective Mickey Adams again investigated Defendant Maresh's background. Det. Adams was asked by Chief Robert Miller of the Parma Police to report on what he found on Maresh. Det. Adams sent a memorandum to Chief Miller, indicating Maresh's prior status as subject of abusing a minor, and as a suspect of sexual imposition. He also indicated that his investigation uncovered that the allegations involved a female cousin of Maresh's, who alleged that Maresh had touched her in an inappropriate manner. He also learned that the parents of the alleged victim requested that no further action or investigation be taken, and the case was closed prior to any further documentation or action being taken. Det. Adams also noted that Commander

Balasko communicated to him that Balasko declined to hire Defendant Maresh because of "too many 'red flags,'" including these two criminal investigations.

17.     Ten days after the memorandum to Chief Miller, Det. Adams submitted his background check memorandum to Defendant Joel Gaiser, Parma Court Administrator. The memorandum submitted to Defendant Gaiser included all of the information transmitted to Chief Miller, notably: Maresh's status as a former suspect of sexual imposition, a sex crime, including that the allegations were made by a female cousin who said that Maresh touched her in an inappropriate manner, and that the investigation was halted at the girl's parents' request (and therefore, not halted because the investigation affirmed Maresh's innocence of the crime).

18.     The memorandum to Defendant Gaiser also included information about Defendant Maresh's MySpace page, which had been accessed during his application process for the Auxiliary Police. His MySpace profile included indications of a potential pornography preoccupation, including his statement that he hates reading "unless its [*sic*] a porno."

19.     The memorandum also noted Maresh's prior status as the subject of abusing a minor in 1996, and that Maresh listed Batman, the anti-establishment comic book character, as one of his heroes on his MySpace page.

20.     Finally, Det. Adams noted in his memo to Defendant Gaiser that Auxiliary Police Commander Balasko declined to hire Maresh because of "too many 'red flags.'"

21.     Det. Adams has also asserted under oath at a deposition that if he found "something in there that [he] thought might be a red flag, or [he] thought [the recipient of the memorandum] might want to check into this, [he] would tell them." He has also asserted under oath that, in this case, he would have made sure that he noted to the recipient of this memorandum, Defendant Gaiser, that Maresh presented concerns.

6

22.     Despite all of these highly concerning issues in Maresh's background, Defendant Gaiser hired or recommended for hire Defendant Maresh as Part-Time Uniformed Bailiff, and signed off on his employment paperwork on or about July 18, 2011. Approximately eight months later, on or about March 1, 2012, Defendant Gaiser promoted or recommended for promotion Defendant Maresh to the position of Probation Officer.

23.     Defendant Gaiser promoted or recommended for promotion Defendant Maresh with full knowledge of the fact that he had previously been accused of a sex crime, and that Maresh publicly spoke about his interest in reading material only if it qualified as pornographic. Defendant Gaiser was also aware of Defendant Maresh having been accused or investigated for abusing a minor. Finally, Defendant Gaiser was aware that other departments in the same city had declined to hire Defendant Maresh because he presented "too many 'red flags.'"

24.     Despite having a large body of highly concerning information about Defendant Maresh, including possible disturbing sexual violations, Defendant Gaiser placed Defendant Maresh in a job position which granted him ultimate power over other people, including women probationees. He had a lot of power, including the power to control whether or not his probationees had their freedom, or whether they would be removed from society and sent to jail for probation violations.  After Defendant Gaiser made Defendant Maresh a Probation Officer, Maresh had discretion available for abuse. He had access to women who were the subjects of his newfound authority, and who needed to keep him happy in order to remain out of jail.

25.     In promoting Defendant Maresh, Defendant Gaiser did not merely fail to adequately scrutinize Maresh's background: Gaiser had disturbing and concerning information about Maresh's background, in the form of a memorandum written for and submitted directly to him. Yet Gaiser chose to not to further investigate any of that disturbing and concerning

information. Even more shocking, Defendant Gaiser chose to consciously disregard that disturbing and concerning information in its entirety.

26.     When Defendant Gaiser placed Defendant Maresh in this position, it was a plainly obvious risk that a man who may have previously committed a sex crime (which was not further investigated or prosecuted only because of the victim's family's request), and who had an unusually singular interest in pornographic reading material, who "raised too many red flags" to be hired by other Parma entities, and who long had problems at work with disrespecting the authority of supervisors and theft from the workplace, might very well feel compelled to buck authority and to cross the proverbial line, and to engage in inappropriate or even abusive sexual behavior with women he encountered through work.

27.     What Defendant Maresh did to Plaintiff Medas was a plainly obvious consequence of Defendant Gaiser's hiring and/or promotion decisions. Defendant Gaiser was aware of Defendant Maresh's shady past, and promoted him and/or recommended him for promotion to the position of Probation Officer anyway. In so doing, Defendant Gaiser consciously disregarded an obvious risk that Maresh might subsequently inflict a constitutional injury in the form of a sex crime.

### Plaintiff Medas Becomes Defendant Maresh's Probation Officer and Maresh Immediately Engages in Inappropriate Behavior

28.     In June of 2012, Ms. Medas was placed on probation by a Parma Municipal Judge after being found guilty of a DUI.  Her probation was under the control and supervision of Defendant Maresh. Under the terms of her probation, she was required to report to Maresh and to comply with various conditions of her sentence. He had the power and authority to enforce conditions of probation and to seek violation of probation, which could include incarceration.

Essentially, he controlled her freedom and various aspects of her life for the duration of the probation period.

29.     On or about June 5, 2012, Defendant Maresh sent a text to Ms. Medas' cell phone after their initial probation meeting. He wrote, "You look pretty in that dress."  Initially, Plaintiff Medas mutually flirted with Defendant Maresh. After that date, however, the texts continued and turned increasingly inappropriately sexual. He eventually began sending her nude photos. Plaintiff Medas was not sure what to do about the situation, feeling she needed to not upset her probation officer. She marginally participated in the sexual texting he continued to send to her, but became increasingly uncomfortable with the situation. She continued to receive vulgar text messages from Maresh over the next several days.

**Defendant Maresh Uses the Power of His Position to Threaten and Rape Plaintiff Medas**

30.     On June 20, 2012, Defendant Maresh sent a text to Plaintiff Medas stating, "Ummmm I can't guarantee that I won't rape u Friday limited." The very next day, Defendant Maresh went to Ms. Medas' residence in North Royalton, Cuyahoga County, Ohio. While there, he reminded her that he had her whole life in his hands. Then he raped her. He told her he just wanted her to have "a little taste of [her] officer."

31.     The next day, Defendant Maresh sent apologetic texts, saying he felt like he violated Plaintiff Medas. Nonetheless, he returned to Plaintiff Medas' apartment just four days later, at lunch time. He again tried to sexually assault her. However, Plaintiff Medas' daughter, Plaintiff Z.M., and two other little girls were playing together at the apartment and on the grounds outside. Their presence prevented him from completing a second assault.

**Plaintiff Medas Reports Defendant Maresh and He Is Convicted of Sexual Battery**

32.     Afraid that Defendant Maresh would retaliate against her, Plaintiff Medas remained silent about the assault for approximately one week before telling her father, John Medas.  She subsequently reported the assault to the North Royalton Police.  Defendant Maresh was immediately terminated from his position as a Probation Officer for the Parma Municipal Court, and a criminal investigation was initiated. Because Plaintiff Z.M., Ms. Medas' daughter, saw Defendant Maresh at the home, she was required to give a statement identifying him, and was listed as a witness. She knew what happened to her mother, and suffered serious emotional distress as a result.

33.     On September 10, 2012, Defendant Maresh was indicted in Cuyahoga County under Case Number CR-12-565381-A for sexual battery, in violation of Ohio Revised Code §2907.03(A)(1) and (6).  Section (A)(1) prohibits sexual conduct with another when "the offender knowingly coerces the other person to submit by any means that would prevent resistance by a person of ordinary resolution." Section (A)(6) prohibits sexual conduct with another when "the other person is in custody of law or a patient in a hospital or other institution, and the offender has supervisory or disciplinary authority over the other person." Defendant Maresh went to trial and was found guilty on both charges, and on June 17, 2013, was sentenced to three (3) years in prison.

**Plaintiffs Suffered and Continue to Suffer Severe Emotional Distress,**
**Living in a State of Trauma and Fragility, after this Preventable Ordeal**

34.     After this came horrific series of events came to light, and while Maresh awaited trial, Plaintiff Medas was subsequently required to serve a six-month sentence for the DUI due to a probation violation committed as a result of abusive power and stress under Maresh's custody. She was sent to jail while still in a state of trauma. She was required by the Parma Court to serve

her sentence in the Cuyahoga County jail, locked up with hardcore prisoners when she already had mental and physical injuries. Plaintiff Medas' fragile state, due to Defendant Maresh's actions, made this experience torturous for her. This jail time exacerbated Plaintiff Medas' ongoing and severe emotional injuries resulting from Maresh's abuse and rape.

35.     As a result of Defendants' actions, Plaintiff Brooke Medas suffered physical injuries, including bruising, scratching, and extreme violation of her bodily integrity. She also suffered and continues to suffer from mental injuries that are permanent in nature. Her injuries include, but are not limited to, severe post-traumatic stress disorder and anxiety, nightmares, psychological distress, decreased appetite and related digestive problems, decreased energy, feelings of helplessness, loss of concentration, loss of memory, and other conditions resulting from her mental distress. She is under the care of therapists.  This event has permanently affected her life in numerous ways, altering her ability to function without fear, paranoia, and depression. The horror of this experience is always present.

36.     As a result of Defendants' actions, Plaintiff Z.M., the daughter of Brooke Medas, has also had to seek counseling to address the severe emotional distress she has suffered as a result of these events. She also suffers from the loss of consortium of her mother due to the ongoing mental injuries Brooke suffers as a result of these events.

**FIRST CLAIM FOR RELIEF**

**42 U.S.C. § 1983 Civil Rights Claim against Defendant Maresh**

37.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth here.

38.    Defendant Maresh committed sexual battery against Plaintiff Medas while acting as her probation officer. Defendant Maresh's actions against Plaintiff Medas were at all times herein performed under the color of state law and deprived Plaintiff Medas of federally protected rights, in violation of 42 U.S.C. § 1983.

39.    Defendant Maresh deprived Plaintiff Medas of her rights to bodily integrity and to be free from excessive force, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

40.    Defendant Maresh acted wantonly, willfully, maliciously, and with a reckless disregard for Plaintiff Medas' rights by committing acts of sexual battery against her.

46.    As a direct and proximate result of Defendant Maresh's actions, Plaintiff suffered and will continue to suffer harm and damages caused by Defendant Maresh.

**SECOND CLAIM FOR RELIEF**

**State Law Claim of Battery against Defendant Maresh**

41.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth here.

42.    Defendant Maresh's acts of unlawful sexually battery against Ms. Medas were the direct and proximate cause of physical injury to her body, as well as psychological injury.

43.    Defendant Maresh intentionally caused said harm to Plaintiff Medas.

12

44.     The damages Plaintiff Medas sustained were a direct and proximate result of the above injuries caused by Defendant Maresh.

### THIRD CLAIM FOR RELIEF

### State Law Claim of Intentional and/or Negligent Infliction of Emotional Distress against Defendant Maresh

45.     All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth here.

46.     Plaintiff Z.M., ten years old at the time of the assault, continues to receive mental health counseling as a result of the Defendant Maresh's assault on her mother, Plaintiff Medas. Plaintiffs have incurred costs for this care and will continue to incur costs in the future.

47.     Plaintiff Medas has similarly been emotionally harmed as a result of Defendant Maresh's criminal conduct, and remains traumatized by the incident. As a direct and proximate result of Defendant Maresh's conduct, has suffered severe mental distress, including, but not limited to, depression, anxiety, decreased appetite, decreased energy, feelings of helplessness, loss of concentration, loss of memory, and other physical conditions.

48.     Plaintiffs' injuries were foreseeable and Defendant Maresh knew or should have known that such outrageous conduct would cause and/or result in said severe mental injury to the Plaintiffs.

### FOURTH CLAIM FOR RELIEF

### State Law Claim of Willful, Wanton and Reckless Conduct against Defendant Maresh and Defendant Gaiser

49.     All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth here.

50.     Defendant Maresh disregarded the public trust granted to his position as a Probation Officer and acted in a willful, wanton, and/or reckless manner while engaged in his work as a Probation Officer, resulting in emotional and physical injury to Plaintiffs.

51.     Defendant Gaiser disregarded the public trust granted to his position as Parma Court Administrator when he acted in a willful, wanton, and/or reckless manner when he hired and or recommended for hire, and promoted and/or recommended for promotion Defendant Maresh to the position of Probation Officer. Such reckless, wanton, and willful conduct proximately caused physical and psychological injury to Plaintiffs as set forth in this Complaint.

### FIFTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983 Civil Rights Claim against Defendant Gaiser

52.     All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth here.

53.     In making the decision to hire and/or recommend for hire and to promote and/or recommend for promotion Defendant Maresh, Defendant Gaiser failed to adequately scrutinize Maresh's character and fitness for the position of Probation Officer by not investigating the body concerning information he had in his possession, and by not digging deeper into Maresh's obviously shady past.

54.     Defendant Gaiser further chose to intentionally disregard the safety and constitutional rights of future probationees when he ignored past allegations of sex crimes made against Maresh, Maresh's unusually singular interest in pornographic reading materials, his suspect status in relation to the crime of abusing a minor, and Maresh's rejection from other Parma job postings because of "too many 'red flags.'"

14

55. Had Defendant Gaiser investigated further, or even simply considered this body of highly concerning information about Maresh's past, he would have concluded that Maresh did not have character to work as a probation officer and that the battery committed against Plaintiff Medas was a highly likely and plainly obvious risk and/or consequence of the hiring and/or promotion decision.

56. Defendant Gaiser's intentional disregard rises to the level of deliberate indifference to the rights and safety of future probationees under the care of Defendant Maresh. Defendant Gaiser's actions were at all times herein performed under the color of state law and deprived Plaintiff Medas of federally protected rights, in violation of 42 U.S.C. § 1983.

57. Therefore, Defendant Gaiser's deliberate indifference to the warning signs resulted in the unlawful and unconstitutional conduct of his employee and consequently he is directly liable for the acts of Defendant Maresh, pursuant to 42 U.S.C. § 1983.

### SIXTH CLAIM FOR RELIEF

### Loss of Consortium against Defendants Maresh and Gaiser

58. All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth here.

59. As a result of the injuries caused to Plaintiff Medas, caused by the intentional, willful, wanton, reckless, deliberately indifferent, and/or negligent acts and omissions of the Defendants, Plaintiff Z.M. has lost the consortium of her mother, Plaintiff Medas.

### DAMAGES

54. As a direct and proximate result of the Defendants' conduct, Plaintiff Medas suffered physical injuries, and both Plaintiffs have suffered and continue to suffer mental anguish and psychological and emotional distress, some or all of which may be permanent.

55.     As a direct and proximate result of the Defendants' conduct, Plaintiffs have incurred substantial costs and expenses, including, but not limited to, medical and mental health therapy fees, and financial losses due to the inability to be employed.

56.     Plaintiffs' mental, emotional and psychological injuries are serious, and are of such a nature that no reasonable person could be expected to endure.

### PRAYER FOR RELIEF

Accordingly, Plaintiffs request as follows:

(A)     That the Court award compensatory and consequential damages for all the injuries identified in an amount greater than $25,000.00, the jurisdictional amount, for each Plaintiff;

(B)     That the Court award punitive damages in an amount to be determined at trial that will deter such conduct by Defendants and others in the future;

(C)     For a trial by jury;

(D)     Court costs, interest, attorney's fees, and all other relief which this Honorable Court deems just and equitable.

Respectfully submitted,

FRIEDMAN & GILBERT

/s/ Terry H. Gilbert
TERRY H. GILBERT (0021948)
55 Public Square, Suite 1055
Cleveland, OH 44113-1901
Telephone:     (216) 241-1430
Facsimile:     (216) 621-0427
E-Mail:        tgilbert@f-glaw.com

*Counsel for Plaintiffs*

16